**CASE NO. 22-1824**

# IN THE

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
## FOR THE FOURTH CIRCUIT

PAUL TRUETT CANADY, II,
Administrator for the Estate of Jimmie Andrew Underwood, a/k/a
James Blackmon, a/k/a James Blackman, a/k/a Jimmy Lee Hooker,

*Plaintiff - Appellant,*

v.

JAMES HOLDER, in his individual capacity;
ANDREW MUNDAY, in his individual capacity;
CITY OF RALEIGH.,

*Defendants - Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA AT RALEIGH

## RESPONSE BRIEF OF APPELLEES

Jason R. Benton
Daniel E. Peterson
PARKER, POE, ADAMS &
BERNSTEIN LLP
Bank of America Tower
620 South Tryon Street
Suite 800
Charlotte, NC 28202
(704) 372-9000
jasonbenton@parkerpoe.com
danielpeterson@parkerpoe.com

Rachel E. Keen
Sonny S. Haynes
WOMBLE BOND
DICKINSON (US) LLP
One West 4th Street
Winston-Salem, NC 27101
(336) 721-3569
rachel.keen@wbd-us.com
sonny.haynes@wbd-us.com

Norwood Pitt Blanchard, III
CROSSLEY MCINTOSH
COLLIER HANLEY &
EDES PLLC
5002 Randall Parkway
Wilmington, NC 28403
(910) 762-9711
norwood@cmclawfirm.com

*Counsel for Appellee*
*James Holder*

*Counsel for Appellee*
*Andrew Munday*

*Counsel for Appellee*
*City of Raleigh*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __22-1824__        Caption: __Paul Canady, II v. James Holder, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__James Holder__
(name of party/amicus)

_____

who is _____Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

      N/A

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

      N/A

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
If yes, identify entity and nature of interest:

   N/A

5. Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

   N/A

6. Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

   N/A

7. Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

   N/A

Signature: /s/ Jason R. Benton _____     Date: _____08/18/2022_____

Counsel for: James Holder _____

- 2 -

[Print to PDF for Filing]

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 22-1824        Caption: Paul Canady, II v. James Holder, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Andrew Munday
(name of party/amicus)


who is _____ Appellee _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO


2.    Does party/amicus have any parent corporations?  ☐ YES ☑ NO
      If yes, identify all parent corporations, including all generations of parent corporations:


3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Sonny S. Haynes                     Date:     August 16, 2022

Counsel for: Appellee Andrew Munday

- 2 -

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __22-1284__     Caption: __Paul Truett Canady, II, et al v. James Holder, Andrew Munday, et al__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__City of Raleigh__
(name of party/amicus)

_____

who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO

2.  Does party/amicus have any parent corporations?                              ☐ YES ☑ NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                                    ☐ YES ☑ NO
    If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct
    financial interest in the outcome of the litigation?                    ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected
    substantially by the outcome of the proceeding or whose claims the trade association is
    pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
    party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
    caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
    corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?        ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational
    victim of the criminal activity and (2) if an organizational victim is a corporation, the
    parent corporation and any publicly held corporation that owns 10% or more of the stock
    of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Norwood P. Blanchard, III                Date:        8/19/2022

Counsel for: City of Raleigh

- 2 -

Print to PDF for Filing

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .......................................................... iii

STATEMENT OF THE ISSUES........................................................1

STATEMENT OF FACTS ................................................................1

SUMMARY OF THE ARGUMENT ..................................................5

ARGUMENT ..................................................................................7

I.     THE DISTRICT COURT CORRECTLY CONCLUDED THAT
HOLDER AND MUNDAY WERE ENTITLED TO QUALIFIED
IMMUNITY FROM THE § 1983 CLAIMS BROUGHT
AGAINST THEM IN THEIR INDIVIDUAL CAPACITIES ..................7

     A.    Appellant has attempted to allege an intentional fabrication
of evidence claim because he knows that he cannot allege a
successful coerced confession claim................................................9

     B.    Appellant's cited legal authority for his purported
intentional fabrication of evidence claim is inapposite..................11

     C.    There is only one decision within the geographic boundaries
of this Circuit that has addressed the type of fabrication
claim that Appellant attempts to assert, and Appellant has
ignored it ........................................................................17

          i.    *Washington I* ........................................................18

          ii.    *Washington II*........................................................19

          iii.    *The Washington Appeal* ........................................21

     D.    Appellant's factual allegations irreconcilably contradict the
legal standard required for his theory of recovery under §
1983 ........................................................................22

i

E.    The District Court appropriately concluded that, at most, the Complaint identified a "negligent mental state" attributable to Holder and Munday ...................................................................26

II.    THE DISTRICT COURT CORRECTLY REJECTED THE APPELLANT'S ASSERTION THAT ITS RULINGS WERE "CLEARLY ERRONEOUS." ................................................................29

CONCLUSION ..........................................................................................35

CERTIFICATE OF COMPLIANCE .......................................................38

# TABLE OF AUTHORITIES

## Cases

*Arkansas Nursing Home Acquisition, LLC v. CFG Community Bank*,
    460 F. Supp. 3d 621 (D. Md. 2020) .................................................................. 23

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ........................................................................................ 11

*Colorado v. Connelly*,
    479 U.S. 157, 107 S. Ct. 515 (1986) ......................................................... 10, 11

*Gilliam v. Sealey*,
    932 F.3d 216 (4th Cir. 2019) ...................................................................... 13, 14

*Goines v. Valley Community Servs. Bd.*,
    822 F.3d 159 (4th Cir. 2016) .......................................................................... 23

*Gonzalez v. City of Waukegan*,
    220 F. Supp. 3d 876 (N.D. Ill. 2016) .......................................................... 15, 16

*Halsey v. Pfeiffer*,
    750 F.3d 273 (3d Cir. 2014) ....................................................................... 14, 15

*Harlow v. Fitzgerald*,
    457 U.S. 800 (1982) ......................................................................................... 8

*Hill v. Crum*,
    727 F.3d 312 (4th Cir. 2013) ....................................................................... 8, 12

*Humbert v. Mayor and City Council of Baltimore City*,
    866 F.3d 546 (4th Cir. 2017) ..................................................................... 33, 34

*In re Livent, Inc. Noteholders Securities Litigation*,
    151 F. Supp. 2d 371 (S.D.N.Y. 2001) ............................................................ 23

*Massey v. Ojaniit*,
    759 F.3d 343 (4th Cir. 2014) .......................................................................... 32

*Miller v. Prince George's Cty., Md.*,
    475 F.3d 621 (4th Cir. 2007) .......................................................................... 26

*Mitchell v. Forsyth*,
    472 U.S. 511 (1985) ......................................................................................... 7

*Ricciuti v. N.Y. City Transit Authority*,
    124 F.3d 123 (2d Cir. 1997) .......................................................... 12, 13

*Spencer v. Peters*,
    857 F.3d 789 (9th Cir. 2017) ....................................................... 15, 16

*State v. Blackman*,
    93 N.C. App. 207, 377 S.E.2d 290 (1989) .......................... 4, 9, 27, 28

*Washington v. Buraker*,
    322 F. Supp. 2d 692 (W.D. Va. 2004) ................................ 5, 17, 18, 22, 23, 25

*Washington v. Buraker*,
    322 F. Supp. 2d 702 (W.D. Va. 2004) ........................... 19, 20, 21, 33

*Washington v. Wilmore*,
    407 F.3d 274 (4th Cir. 2005) .......................................................... 21

*Wilson v. Layne*,
    526 U.S. 603 (1999) ........................................................................ 8

*Wilson v. Russo*,
    212 F.3d 781 (3d Cir. 2000) .......................................................... 31

## Statutes

42 U.S.C. §1983 .................................................................. *passim*

## Other Authorities

Fed. R. App. P. 28 ......................................................................... 1
Fed. R. Civ. P. 8 ......................................................................... 23

## STATEMENT OF THE ISSUES

While not required of Appellees' Brief under Fed. R. App. P. 28(b)(2), Appellees dispute the argumentative nature of Appellant's second identified issue and also suggest a more procedurally referential first issue. Accordingly, Appellees identify the following issues before the Court:

1)      Whether the District Court erred by granting Holder and Munday's Motions to Dismiss as to Counts I through III of the Appellant's Complaint based upon qualified immunity? (*See* J.A.101-119.)

2)      Whether the District Court erred by denying Appellant's Motion to Modify the Order granting Holder and Munday's Motion to Dismiss as to Counts I through III of the Appellant's Complaint? (*See* J.A.364-376.)

## STATEMENT OF FACTS

On September 29, 1979, a student named Helena Payton was attacked in the bathroom of her dormitory at St. Augustine's College in Raleigh, North Carolina. (J.A.14-15.) A little over a month after the attack, Ms. Payton died from her injuries. (J.A.14-15.) The case went unsolved for several years. (J.A.15.) Multiple Raleigh Police Department officers were involved in the investigation over those years.

In February 1983, Detective Lockey of the Raleigh Police Department received a tip from a previously used source in Dorothea Dix Hospital that an individual admitted to Dix (*i.e.*, the state psychiatric hospital) had "mentioned the

murder of a black female at St. Augustine College… [t]he suspect talked about murdering other black females in Wake County [North Carolina] (at least three) and at least two (2) murders in New York and New Jersey… The suspect was supposed to have been very graphic in his description of how he killed these women…" (J.A.31.)  The source believed the suspect's name started with the letter B. (J.A.32.) Lockey "contacted a second source at Dix," who "reported that the only subject who fit the criteria was James Blackmon." (J.A.32.)  The detective learned that James Blackmon ("Blackmon") had been previously incarcerated in both Wake County, North Carolina [*i.e.*, Raleigh] and at Attica in New York.  (J.A.32.)

Subsequent to the informant's tip to their colleague, the two individually named defendants in this case, Detectives James Holder ("Holder") and Andrew Munday ("Munday"), showed an eyewitness to the murder, Jacqueline Kelly ("Kelly"), "a photo array containing a photo of James Blackmon.  Kelly pulled Blackmon's photo aside, along with the photo of a man named Barry Chavis," commenting that "these two looked like they could possibly be the suspect." (J.A.39.)

On October 25 and 26, 1983, Blackmon voluntarily met with and was questioned by Holder and Munday multiple times (J.A.44-61), during which he (1) freely left and returned to the interviews; (2) was taken to eat at McDonalds (J.A.51); (3) was provided coffee, cigarettes, and transportation (J.A.19); (4) was free to use

the restroom (J.A.53); and (5) was allowed to walk around the campus of St. Augustine's on his own recognizance. (J.A.50.)

During those interviews, Blackmon made inculpatory statements to Holder and Munday. Specifically, he (1) stated that he "will know everything" if he visits the top floor of the dormitory (J.A.54.); (2) identified the stall, out of several, where the victim had been attacked (J.A.54.); (3) agreed that he egressed to the woods as the suspect had in-fact done (J.A.57.); and (4) agreed that the "other James Blackmon" might have been present or involved with the attack on the victim at St. Augustine's College (J.A.57-61.)  Significantly, Appellant alleges that Holder and Munday, blinded by confirmation bias and tunnel vision, "believed Blackmon had committed the murder, which caused them to ignore substantial evidence of his innocence and to create a fabricated confession." (J.A.44.)

Blackmon was later arrested on December 7, 1983 and charged with the murder of Helena Payton.  (J.A.71.)  He remained in custody awaiting trial until, on the advice of his legal counsel, he entered a guilty plea to second-degree murder on January 14, 1988.  (J.A.65-66.)  In advising him to plead guilty, Blackmon's criminal defense attorney "advised [him] that he would preserve for appeal the admissibility of the statements obtained by Holder and Munday."  (J.A.65.)

Blackmon thereafter appealed to the North Carolina Court of Appeals, based on "the trial judge's denial of [Blackmon's] motion *in limine* to suppress the

statements [he] made to detectives Holder and Munday." *State v. Blackman*, 93 N.C. App. 207, 213, 377 S.E.2d 290, 294 (1989).[1]  In a published opinion, the North Carolina Court of Appeals affirmed the trial court's decision, rejecting Blackmon's contentions that "he was not mentally competent when he made his admissions" and "that he made the statements during custodial interrogations without the benefit of *Miranda* warnings."  93 N.C. App. at 209-10, 377 S.E.2d. at 292.  Importantly, the Court of Appeals specifically held that Holder and Munday did not act coercively in their tactics while interviewing Blackmon.  *Id.* at 211, 377 S.E.2d. at 293.

In March 2012, the North Carolina Innocence Inquiry Commission ("NCIIC") began investigating Blackmon's case.  (J.A.13.)  Over a six-and-a-half-year period, NCIIC staff members conducted an investigation which ultimately resulted in a three-day hearing before the North Carolina Innocence Commission from November 14-16, 2018. (J.A.14.)  Approximately nine months later, a three-judge panel concluded that Blackmon had proven that he was innocent of Helena Payton's murder.  (J.A.14.)

---

[1] The underlying criminal matter used the name "Blackman" to refer to Appellant's decedent, whereas in this case, his name has been spelled "Blackmon."  There is no dispute, of course, that this is the same individual and that this published case of the North Carolina Court of Appeals refers to the same underlying factual circumstances.

## SUMMARY OF THE ARGUMENT

In 1983, there was no controlling legal precedent to inform a North Carolina law enforcement officer that asking leading, suggestive, or even manipulative questions to a psychologically or mentally infirm suspect was violative of such suspect's federal constitutional right to be free from a coercive interrogation/interview. This lack of precedent was confirmed six years later, in 1989, when the North Carolina Court of Appeals specifically held that Detectives Holder and Munday had not coerced James Blackmon's confession. Appellant knows this and, accordingly, has carefully avoided casting his § 1983 claims in this action as those deriving from a coerced confession. Instead, in a clever attempt to avoid the application of qualified immunity, Appellant costumed his claims, contorting them into those purporting to sound in "intentional fabrication of evidence." However, the legal authority on which Appellant relies in an attempt to save his § 1983 claims does not address the type of fabrication claim that he spelled out in the facts alleged in his Complaint—that is, a fabricated false confession claim. Only one decision within the jurisdiction of this Circuit has addressed such a unique claim, and Appellant did not cite to it in his brief to this Court: *Washington v. Buraker*, 322 F.Supp.2d 692 (W.D. Va. 2004) (hereinafter "*Washington I*").

Appellant does not wish to bring *Washington I* to the attention of this Court because it dooms his federal constitutional claims. This is because *Washington I*

correctly requires allegations and evidence that Holder and Munday had actual knowledge of Blackmon's innocence at the time of their interviews of him in order to sustain § 1983 claims based on a fabricated false confession that Blackmon himself made. Appellant, though, pled himself out of such a claim, admitting that Holder and Munday believed that Blackmon was guilty of the murder of Helena Payton. The irreconcilable nature of, on the one hand, Appellant's factual admission in his pleading and, on the other hand, the dictates of the unique legal claim he sought to bring, led the District Court to the only possible conclusions it could reach: (1) the dismissal of Appellant's individual-capacity federal constitutional claims on the basis of qualified immunity and (2) the denial of Appellant's Motion to Modify the order granting such dismissal.

That Holder and Munday did not abandon their investigation of Blackmon simply because of the existence of exculpatory evidence (in addition to inculpatory evidence) also does not create a constitutional claim. None of the exculpatory evidence *eliminated* Blackmon as a suspect, and therefore, Holder and Munday were left to weigh competing evidence in determining Blackmon's viability as a suspect— all without the benefit of 20/20 hindsight. As the District Court correctly concluded, at most, the Complaint alleged a negligent state of mind as to Holder and Munday in their crediting of inculpatory over exculpatory evidence and in their resultant pursuit of Blackmon's confession.

The District Court also correctly concluded that Appellant's Motion to Modify the dismissal order was without merit. Again, that Holder and Munday believed Blackmon committed the crime—albeit allegedly as a result of "confirmation bias and tunnel vision"—and as such, credited inculpatory over exculpatory evidence in pursuing Blackmon's confession, is simply not actionable under § 1983.

Accordingly, as further detailed *infra*, the District Court's Orders should be affirmed.

## **ARGUMENT**

**I.    THE DISTRICT COURT CORRECTLY CONCLUDED THAT HOLDER AND MUNDAY WERE ENTITLED TO QUALIFIED IMMUNITY FROM THE § 1983 CLAIMS BROUGHT AGAINST THEM IN THEIR INDIVIDUAL CAPACITIES.**

As discussed further below, the District Court properly applied qualified immunity to the § 1983 claims alleged therein against Holder and Munday.

> Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery… The entitlement is an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.

*Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis in original).

To overcome qualified immunity from § 1983 claims, a plaintiff must plead and prove that a governmental official, acting under color of law, "violate[d] [the plaintiff's] clearly established statutory or constitutional rights of which a reasonable

person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "For a right to be 'clearly established,' in a qualified immunity case, 'the contours of the right must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right.'" *Hill v. Crum*, 727 F.3d 312, 321 (4th Cir. 2013), *quoting*, *Wilson v. Layne*, 526 U.S. 603, 605 (1999). Only jurisprudence in existence at the time of the alleged conduct can clearly establish a constitutional right, and then only case law from the U.S. Supreme Court, this Court, or the North Carolina Supreme Court. *See id.* at 322. ("We have long held that it is case law from this Circuit and the Supreme Court that provide notice of whether a right is clearly established.")

Contrary to the Appellant's assignment of error, the District Court correctly concluded that either (i) knowledge of innocence is required where the allegations concern a fabrication of a confession; and additionally or in the alternative, (ii) any allegations of negligence do not give rise to a constitutional violation. Thus, both prongs of qualified immunity support the District Court's dismissal of the § 1983 claims in this case. Holder and Munday did not violate Blackmon's constitutional rights, and certainly not any constitutional right that was clearly established by the U.S. Supreme Court, this Court, or the North Carolina Supreme Court as of October 1983. Accordingly, the Complaint failed to state the § 1983 claims alleged therein against Holder and Munday.

**A.     Appellant has attempted to allege an intentional fabrication of evidence claim because he knows that he cannot allege a successful coerced confession claim.**

The North Carolina Court of Appeals directly addressed whether, as a matter of law, Holder and Munday's "use of [Blackmon's] psychiatric history to guide their interrogative tactics constituted coercion" in obtaining his confession. *Blackman*, 93 N.C. App. at 211, 377 S.E.2d at 293. The Court of Appeals answered this inquiry, while summarizing the details of the interviews with Blackmon:

> We reject this contention. Holder and Munday clearly ingratiated themselves with defendant and presented themselves as his friends. We are not prepared to hold, however, that simply because the police adopt a strategy for the dealings with a suspect that that strategy is therefore coercive. At no time did these detectives force defendant to submit to any of the ordeals traditionally associated with coercive interrogations… We hold, therefore, that the interviews in which defendant participated with Holder and Munday were not coercive…

*Id.* at 211-12, 377 S.E.2d at 293.

Since an appellate court of law in 1989 did not determine Holder and Munday's conduct to be unconstitutionally coercive, it would, naturally, be incongruent to expect a reasonable law enforcement officer six years earlier to have understood that *same conduct* to be unconstitutional. For purposes of qualified immunity, had the Court of Appeals been bound by authority in either the United States Supreme Court or the North Carolina Supreme Court, then it would have reached the contrary conclusion. At a minimum, Blackmon would have sought

9

discretionary review to the North Carolina Supreme Court and certiorari to the United States Supreme Court, if necessary. As it turns out, he did not.

In fact, when the North Carolina Court of Appeals concluded that Holder and Munday had not acted in a coercive manner, it did so with the benefit of, and relying on, *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515 (1986). In *Connelly*, the Court concluded that a confession was voluntary where a suspect suffering from schizophrenia confessed to a murder. *See id.* at 160-62, 107 S.Ct. at 518-519. After being found competent to stand trial, the suspect moved to suppress his confession. *See id.* At the evidentiary hearing on that motion, a psychiatrist for the State testified that his interviews with Connelly "revealed that respondent was following the 'voice of God.'" *Id.* at 161, 107 S.Ct. at 518. The State's psychiatrist also "testified that Connelly's illness did not significantly impair his cognitive abilities" and that "the 'voices' could in reality be Connelly's interpretation of his own guilt," but that "Connelly's psychosis motivated his confession." *Id.* at 161-62, 107 S.Ct. at 519. In dissent, Justice Brennan, citing to the record on appeal, noted that ***officers knew of Connelly's mental illness when they obtained the confession from him***. *Id.* at 180, 107 S.Ct. at 528 n.3 (Brennan, J., dissenting) (emphasis added).

After the lower state court excluded the confession on the grounds that it was involuntarily given and the Colorado Supreme Court affirmed, the United States Supreme Court reversed, holding "that coercive police activity is a necessary

predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause." *Id.* at 167, 107 S.Ct. at 522. "Respondent's perception of coercion flowing from the 'voice of God,' [*i.e.*, internal mental influences on the suspect] however important or significant such a perception may be in other disciplines, is a matter to which the United States Constitution does not speak." *Id.* at 170-71, 107 S.Ct. at 523-524.

Appellant knows that there are rigid legal obstacles to successfully asserting that Blackmon's confession was unconstitutionally coerced by the conduct of Holder and Munday in 1983. This is likely why he retreats from allegations of coercion, (Appellant Br. 37, ECF No. 19), and strains, unsuccessfully, to allege an intentional fabrication of evidence theory to shore up his § 1983 claims.

**B.    Appellant's cited legal authority for his purported intentional fabrication of evidence claim is inapposite.**

In criticizing the District Court, the Appellant consistently mislabels the inculpatory statements made by Blackmon as "fabricated evidence" by Holder and Munday. Neither this Court, nor the District Court before it, is obliged to accept as true the "labels and conclusions" fashioned in the Complaint by the Appellant. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions…"). The conduct that the Appellant mislabels as the detectives'

fabrication of evidence through alleged "manipulative techniques" is, paradoxically,

***Blackmon's own words***. (Appellant Br. 23, ECF No. 19.)

None of the cases cited in Appellant's Brief refer to inculpatory statements actually made by a plaintiff as "fabricated evidence" created by the interviewing law enforcement officers. For instance, Appellant turns to the Second Circuit where that court addressed a confession fabricated, or manufactured, by the police where the plaintiff denied having made the statements attributed to him—*i.e.*, ***not*** statements actually made by the declarant as a result of "manipulative [interview] techniques," as is alleged here. *Ricciuti v. N.Y.C. Transit Authority*, 124 F.3d 123 (2d Cir. 1997).[2] Thus, while it is true that *Ricciuti* is a § 1983 case concerning a fabricated confession, the crucial distinction between the Blackmon confession and the confession in *Ricciuti* is that the plaintiff in *Ricciuti* denied ever making the statement at all, claiming that the police lieutenant typed an unsigned and fictitious

---

[2] Though *Ricciuti* is entirely inapposite to the case at bar, Appellees note that the fabricated confession in *Ricciuti* took place in 1989 and the Second Circuit's opinion is from 1997—both years after the confession in this case from 1983. Thus, even if the facts in *Ricciuti* bore a sufficient nexus to the factual allegations *sub judice*, the opinion in *Ricciuti* could not have put Holder and Munday on notice that their conduct violated the Appellant's clearly established rights in 1983. *See Hill*, 727 F.3d 312, 321 (4th Cir. 2013). ("In deciding whether a defendant is entitled to qualified immunity, we examine… whether [a defendant's] conduct was objectively reasonable in view of the clearly established law at the time of the alleged event.") Moreover, this Court does not rely on out-of-circuit precedent in determining whether a sufficiently contoured constitutional right was clearly established at the time of the alleged violative conduct. *See id.* at 322.

confession. *See Ricciuti*, 124 F.3d at 126. The plaintiff in *Ricciuti*, therefore, alleged what Appellant does not here—that the police department attributed to him an entirely manufactured statement that he claims to have never made. While Appellant disclaims coercion, his Complaint discloses that Blackmon actually made the inculpatory statements.

Another case cited by Appellant—in this instance from this Circuit—is the same type of alleged fabrication contemplated by the Second Circuit in *Ricciuti*, *i.e.*, investigators attributing a confession to the suspect that the suspect disavows ever making. *See*, *e.g.*, *Gilliam v. Sealey*, 932 F.3d 216, 226-28 (4th Cir. 2019). *Gilliam* involved murder confessions that officers represented were made by two brothers. *See id*. The first of two would-be declarants, McCollum, said of his alleged signed confession that "the officers told him that if he signed a form—the *Miranda* waiver form—they would let him go home." *Id*. at 226-227. "McCollum signed the form without reading it… and [during the interview with officers] McCollum repeatedly denied being involved." *Id* at 227. "McCollum signed the paper—which was actually the confession written out by Snead—but he did not read it and it was not read to him. **McCollum denies that he confessed to raping and murdering Buie.**" *Id.* (emphasis added).

The second of the two would-be declarants, "Brown[,] denied any knowledge of the crime and stated that he was innocent" during his interrogation with officers.

13

*Id.*   "***Brown testified… that he did not say the things that are written in the confession***…" and only signed it "after an officer told him doing so would ensure his release."   *Id.* at 227-28 (emphasis added).[3]   When he read the confession thereafter, "***Brown told the officers that it was not true***."   *Id.* at 228 (emphasis added).

Thus, both plaintiffs in *Gilliam* contended that they (1) denied their guilt in their respective interviews with officers, (2) were provided forms to sign on promise of release, and (3) signed what turned out to be confessions. Different from Blackmon, both *Gilliam* plaintiffs denied that they made the inculpatory statements attributed to them.[4]

Similarly, in another case cited favorably by Appellant, *Halsey v. Pfeiffer*, 750 F.3d 273 (3d Cir. 2014), the would-be declarant "maintained his innocence

---

[3] The interrogative tactics presented in *Gilliam* are almost polar opposite of how Holder and Munday are alleged to have treated Blackmon.  As summarized in the factual statement of this Brief, *supra*, the Complaint discloses that Blackmon was free to come and go over the course of several days, was taken for food and drink, provided cigarettes and bathroom breaks, driven around, and was free to move about the scene of the crime on his own.

[4] Moreover, as to the qualified immunity analysis in *Gilliam*, while the Court concluded that it was clearly established in 1983 that individuals have a "right not to be arrested without probable cause based on a coerced and fabricated confession," again, Appellant has disclaimed a coercion claim here and the fabrication in *Gilliam*, as discussed *supra*, is an actual manufacturing of a confession replete with a dispute over whether the inculpatory statements were ever made by the plaintiffs.  That dispute does not exist here and, thus, *Gilliam* is inapposite.

throughout the interrogation" but an interrogating officer "recorded the alleged confession in a question-and-narrative-answer format," and "slid[] each finished page of what appeared to be a summary of [the declarant's] oral confession underneath the door" to a waiting prosecutor. *Id.* at 283-84. The alleged declarant signed an "incriminating statement" but "claimed in his deposition to have signed the statement to 'get away' from the detectives…" *Id.* at 284. In *Halsey*, the Third Circuit held that a genuine dispute of material fact existed as to the fabricated confession. *See id.* at 294-295. However, and like the cases discussed *supra*, crediting the plaintiff's version of the interrogation, the inculpatory statement itself was actually manufactured by the officers—*i.e.*, the plaintiff in *Halsey* contended he never made the inculpatory statements attributed to him by the officers in the alleged confession.[5] Moreover, the Third Circuit went out of its way in *Halsey* to limit its holding, observing "testimony that is incorrect or simply disputed should not be treated as fabricated merely because it turns out to be wrong." *Id.* at 295.

Appellant's reliance on *Gonzalez v. City of Waukegan*, 220 F.Supp.3d 876 (N.D. Ill. 2016) and *Spencer v. Peters*, 857 F.3d 789 (9th Cir. 2017), (Appellant Br.

---

[5] Appellant's reliance on *Halsey* suffers from the same limitations as his reliance on *Ricciuti* with respect to the 'clearly established' prong of qualified immunity. In addition to being inapposite from a factual perspective as described herein, the alleged officer misconduct took place in 1985 and this out-of-circuit opinion was issued in 2014—all after the alleged officer misconduct took place *sub judice*, in 1983.

22, ECF No. 19), is equally misplaced. *Gonzalez*, similar to *Ricciuti*, *Gilliam*, and *Halsey*, involved a confession authored by law enforcement, which was signed by a plaintiff-suspect who later disavowed ever making the confession. *Gonzalez*, 220 F.Supp.3d at 882. The subject fabrication in *Spencer* was the defendant-officer's mischaracterization of witness statements in her investigative reports. *Spencer*, 857 F.3d at 793.

> In contrast, Appellant alleges the following in the Complaint:
>
> 149.   By 1983 it was well known to law enforcement that ***mentally ill*** people and people with intellectual disabilities… were highly suggestible and prone to making unreliable and false statements under police questioning.
> (…)
>
> 151.   Despite this, Holder and Munday deliberately and intentionally used Blackmon's mental illness and delusions to fabricate a false confession to the murder of Helena Payton.
>
> 152.   In interrogating Blackmon, Holder and Munday used the following ***techniques***, all of which they knew, or reasonably should have known, were likely ***to lead <u>him</u> to fabricate a false confession***…

(J.A.43) (emphases added).

Significantly, Appellant alleges in the Complaint that Blackmon—*i.e.*, "him" in Paragraph 152, and *not* Holder or Munday—"fabricate[d] a false confession" because "Holder and Munday used… techniques," and because he was "highly suggestible" as a result of his "mental ill[ness]." Put another way, Appellant alleges

that Holder and Munday caused Blackmon to "fabricate" evidence against himself. That theory of fabrication is not endorsed by any of the opinions cited by Appellant.

Thus, while Appellant has pointed to case law that, at a very general level, discusses the uncontroversial concept that the fabrication of evidence by law enforcement or prosecuting authorities has long been recognized as a constitutional deprivation, Appellant has not pled facts consistent with a fabrication claim, nor has Appellant directed the Court to any case law which recognizes the "fabrication" he purports to plead.

### C. There is only one decision within the geographic boundaries of this Circuit that has addressed the type of fabrication claim that Appellant attempts to assert, and Appellant has ignored it.

Appellant contends that the District Court "went amiss" because "[its] opinion focused on whether Munday and Holder knew [Blackmon] was innocent when they fabricated the false evidence." (Appellant Br. 29, ECF No. 19.) This is actually where Appellant's argument goes "amiss," as the District Court's focus is supported by *Washington I*. Even so, Appellant selectively quoted from other decisions in the *Washington* line, discussed below, to create the appearance of jurisprudential support for his claims where none actually exists. When unpacked, the *Washington* line of cases supports the District Court's dismissal of the fabrication claims made in this case.

### i.    *Washington I*

*Washington I*, the first in the line of reported decisions deriving from the same action, involved two sources of alleged fabrication at the district court level: (1) an alleged "fabricated false confession" resembling Appellant's purported claim in this case; and (2) the alleged fabrication of a police report (and trial testimony) of one of the defendant-officers. *See Washington I*, 322 F.Supp.2d at 695. This is the only reported case within the confines of the Fourth Circuit that appears to recognize the unique claim that Appellant pursues in this action—that is, one in which law enforcement officers are alleged to have caused the plaintiff to fabricate his own false confession. Importantly, the *Washington I* court considered the question of whether the defendant-officers' had actual knowledge of the innocence of the plaintiff-suspect as the lynchpin issue in the "fabricated false confession" claim. *Id*. at 697-698.

In a critical distinction from the present case, the plaintiff in *Washington I* did not allege that the investigating officers "believed [the suspect] had committed the murder." Accordingly, recognizing that the defendant-officers' actual knowledge, or lack thereof, of the plaintiff's innocence was the determining inquiry on the "fabricated false confession" claim, the district court ordered limited discovery as to "whether [the investigating] officers… had ***actual*** knowledge of Washington's innocence at the time of Washington's interrogation" before ruling on the officers' dispositive motions. *Id.* at 698 (emphasis added). This is likely why, while referring

18

this Court to other decisions within the *Washington* line of cases (which are discussed below), Appellant did not cite to *Washington I* in his brief.

>    ii.    ***Washington II***

By the time of *Washington v. Buraker*, 322 F.Supp.2d 702 (W.D. Va. 2004) ("*Washington II*"), the plaintiff had conducted limited discovery related to the officers' alleged knowledge of his actual innocence, and was unsuccessful in forecasting any evidence to that effect. 322 F.Supp.2d 702, 708. ("There is no evidence on the record tending to show that [the investigating officers] knew that Washington was actually innocent of the Williams murder when he was interrogated following his arrest…")  As a result, Washington's fabrication claim shifted to the issue that ultimately made its way to this Court. *See id*. His fabrication claim no longer concerned an allegation that the defendant-officers actually knew Washington was innocent but "fabricated" a confession anyway; rather, the fabrication claim that survived *Washington II*, and was eventually reviewed by this Court, was based on entirely separate conduct:

> Washington's fabrication claim is based on evidence that his confession included nonpublic facts.  Washington does not contend that the use of leading questions violates a suspect's rights.  The concern, rather, is that [Officers] Wilmore and Hart later claimed that nonpublic information originated from Washington.  ***Specifically, Washington accuses Wilmore and Hart of "falsely documenting, misreporting to the prosecutor (and testifying) that the nonpublic information originated with Washington.***"

*Id.* at 709 (emphasis added).

The *Washington II* trial court examined the evidence against the two defendant-officers, Wilmore and Hart, and concluded that the fabrication claim against Wilmore could survive, but that the fabrication claim against Hart could not. A police report authored by Wilmore that was at the center of the claim against him stated, "that Washington 'gave pertinent information about the crime that no one knew with the exception of himself.'" *Id.* at 710. Moreover, referring to a prosecutor's memorandum concerning a telephone conversation between the prosecutor and Wilmore ten years after the subject trial testimony, the court concluded that it "does not establish . . . evidence concerning the circumstances of Washington's confession, but it does show that Wilmore was concerned that the record did not accurately reflect Washington's confession." *Id.* at 711. Ultimately, given the foregoing evidence against him, Wilmore's summary judgment motion based on qualified immunity was denied.

However, the court found that summary judgment was appropriate as to Officer Hart, who was not implicated in the evidence used to justify denial of qualified immunity to Wilmore:

> ***Even assuming that Hart asked Washington leading questions***, the record supports the conclusion that Washington answered those questions, and confessed to the Williams murder. ***The confession itself was not a fabrication***.

*Id.* at 712 (emphasis added).

20

*Washington II*'s discussion of the summary judgment motions of Wilmore and Hart is instructive because it highlights the two very distinct types of fabrication claims that Appellant conflates in his principal brief. While the fabrication claim against Wilmore became the focus of the Fourth Circuit's review, the claim against Hart that he fabricated Washington's confession by asking leading questions never survived *Washington II*. Here too, even assuming Holder and Munday asked Blackmon leading questions, the factual allegations of the Complaint support the conclusion that the confession itself was not a fabrication, particularly because the Appellant unequivocally alleges that Holder and Munday believed Blackmon committed the murder.

### iii.    The Washington Appeal

Wilmore appealed the denial of qualified immunity by the district court and this Court affirmed. *Washington v. Wilmore*, 407 F.3d 274 (4th Cir. 2005) (hereinafter "*Washington* Appeal"). This Court's opinion, then, did not address the fabrication of a "false confession"; rather, closer to the facts in *Spencer*, it addressed fabricated statements in a police report ***mischaracterizing*** the plaintiff's confession. *See id*. As such, the *only* evidence of a fabrication claim that survived for this Circuit's review was related to fabrication of a police report and subsequent trial testimony thereupon.

Admittedly, actual knowledge of a suspect's innocence may not *always* be required in order for fabricated evidence, in general, to be actionable under § 1983. However, it *must* be required under Appellant's alleged facts. As *Washington I* instructs, the question of whether Holder and Munday knew of Blackmon's innocence when they interviewed him goes to the central issue of whether they were deliberately eliciting a false confession from him. For *only* if Holder and Munday knew Blackmon was innocent could they have known that Blackmon was fabricating his own confession based on their leading questions. The actual knowledge requirement in *Washington I*—invoked only when the alleged fabrication is a confession uttered by the suspect himself—is a necessary shield, preventing a "fabricated false confession" claim from devolving into the exact claim that has no support under the law: one that seeks to foist liability on to investigators for asking leading, suggestive and even manipulative questions, in 1983, of an infirm confessor.

### D.    Appellant's factual allegations irreconcilably contradict the legal standard required for his theory of recovery under § 1983.

Appellant contends that "all [he] was required to do" in his Complaint "was plead factual allegations that raise a right to relief above a speculative level," such that the Complaint "state[s] a claim to relief that is plausible on its face." (Appellant Br. 19, ECF No. 19) (internal quotations and citations omitted). The District Court, however, rooted its dismissal of the § 1983 claims on the fact that Holder and

22

Munday's alleged belief that Blackmon was guilty "directly contradicts" his theory of liability.  (J.A.117.)

"[W]hen a complaint contains inconsistent and self-contradictory statements, it fails to state a claim." *Arkansas Nursing Home Acquisition, LLC v. CFG Community Bank*, 460 F. Supp. 3d 621, 637 (D. Md. 2020); *see also, In re Livent, Inc. Noteholders Securities Litigation*, 151 F. Supp. 2d 371, 405-406 (S.D.N.Y. 2001) (collecting cases) (*e.g.*, "...a court need not feel constrained to accept as truth conflicting pleadings... that would render a claim incoherent, or that are contradicted... by statements in the complaint itself...".); *cf., Goines v. Valley Community Srvcs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (the same principle applies where there exists a "conflict between the bare allegations to the complaint and any exhibit attached ..., the exhibit prevails.").

Appellant's own allegation that Holder and Munday ***believed that Blackmon was guilty*** of the murder of Helena Payton pled him right out of the very claim he was attempting to make—a *Washington I*-style fabricated false confession claim.

Contending that, in spite of his admission concerning the detectives' belief in Blackmon's guilt, he met the pleading requirements of Fed. R. Civ. P. 8, Appellant suggests that Holder and Munday "arrest[ed] [Blackmon] in the absence of any inculpatory evidence other than what they had fabricated...." (Appellant Br. 24,

ECF No. 19.)  However, the factual allegations in the Complaint itself belie this assertion.

Under the overstated heading "The Uncorroborated Dix Information," the Complaint discloses that another detective in the Raleigh Police Department received a tip from a previously used source in Dorothea Dix Hospital that an individual admitted to the hospital had "mentioned the murder of a black female at St. Augustine College… [t]he suspect talked about murdering other black females in Wake County [North Carolina] (at least three) and at least two (2) murders in New York and New Jersey… The suspect was supposed to have been very graphic in his description of how he killed these women…" (J.A.31.)  The source believed the name of the suspect started with the letter B. (J.A.32.)  The detective "contacted a second source at Dix," who "reported that the only subject who fit the criteria was James Blackmon." (J.A.32.)  The detective learned that Blackmon had been previously incarcerated in both Wake County, North Carolina [*i.e.*, Raleigh] and at Attica in New York.  (J.A.32.)  These are the same geographic locations in which the original source indicated Blackmon had bragged about committing other murders.

Subsequent to their colleague learning such information from his informant, Holder and Munday showed an eyewitness to the murder, Jacqueline Kelly, "a photo array containing a photo of Blackmon.  Kelly pulled Blackmon's photo aside, along

with the photo of a man named Barry Chavis," commenting that "these two looked like they could possibly be the suspect." (J.A.39.) Appellant overemphasizes the failure of Kelly to ***positively*** identify Blackmon in the photo array where she is alleged to have commented that Blackmon "looked heavier" in 1983 than the perpetrator did in 1979. (J.A.39.) Without the benefit of hindsight nearly forty years after the fact, these facts do not eliminate Blackmon as a suspect nor do they negate the fact that Kelly pulled Blackmon's photograph. This, in addition to the other information known about Blackmon from Dix Hospital, was consistent with Blackmon's development as a suspect at the time he was interviewed.

Appellant contends that because there was a "mountain of evidence pointing to Blackmon's innocence, of which Holder and Munday were aware," they must have therefore caused Blackmon to fabricate his confession. (Appellant Br. 31, ECF No. 19.) However, weighing exculpatory evidence against inculpatory evidence is not tantamount to a fabrication of the inculpatory evidence, much less an indication that Holder and Munday had actual knowledge of Blackmon's innocence at the time of Blackmon's inculpatory statements.

Accordingly, the District Court appropriately concluded that, to satisfy the deliberateness standard in *this* due process claim, actual knowledge of innocence was required just as it was in *Washington I*. Since Appellant pled the polar opposite of this standard, his federal constitutional claims were properly dismissed.

E.    **The District Court appropriately concluded that, at most, the Complaint identified a "negligent mental state" attributable to Holder and Munday.**

Appellant contends, in conclusory fashion, that the Complaint pleads facts which "fully support the allegations that the fabrication by Holder and Munday was done in reckless disregard for Blackmon's clearly established constitutional rights," and that "[t]he cases" support this position.    (Appellant Br. 32, ECF No. 19.) However, Appellant's assertion incorrectly assumes that the detectives' interview of Blackmon—without knowledge of his innocence, but instead a belief in his guilt— qualified as "fabricating evidence." Again, this conclusion is not supported by any legal authority, but is instead contradicted by the only authority within this Circuit's geography that has addressed anything resembling Appellant's claim.

Moreover, while it is true that "reckless disregard for the truth" can be a basis for sustaining a due process claim, the Appellant's Complaint alleges facts that contradict this theory.   As discussed above, Holder and Munday had inculpatory information about Blackmon prior to the interviews that resulted in his confession. The detectives could not have had a "high degree of awareness of [Blackmon's inculpatory] statement's probable falsity," *Miller v. Prince George's Cty., Md.*, 475 F.3d 621, 627 (4th Cir. 2007), (1) without actually knowing that Blackmon was innocent and (2) given the existence, at that time, of other inculpatory evidence.

To support his "reckless disregard" theory of liability, the Appellant directs the Court to his allegations of Holder and Munday's (1) knowledge of exculpatory evidence as to Blackmon and (2) calculated exploitative interrogation tactics, which, as Appellant asserts, the detectives knew were likely to result in a false confession. (Appellant Br. 33, ECF No. 19.) Yet, the Appellant also explicitly acknowledges that the "suggestive and manipulative tactics… may fall short of coercion." (Appellant Br. 37, ECF No. 19.)  It strains logic, though, to, on the one hand, ask this Court to reverse the District Court on the basis that the detectives acted deliberately or recklessly in using "suggestive and manipulative tactics" on Blackmon because they "did know—that the tactics… were highly likely to generate a false confession" (J.A.75) and, on the other hand, admit that such conduct "may" not be coercive.  Regardless, the North Carolina Court of Appeals vindicated the detectives' interrogation tactics over three decades ago. *Blackman*, 93 N.C. App. at 211, 377 S.E.2d at 293.

Moreover, Holder and Munday are not alleged in the Complaint to have had any special ability to assess Blackmon's competency.  The North Carolina Court of Appeals, though, addressed Blackmon's claimed incompetency at the time he confessed, by summarizing evidence before the trial judge, and therefore capturing the totality of the circumstances presented to Holder and Munday on the characteristics of the accused:

> In our view, some of the medical and other evidence in this case would support a conclusion that this defendant was not competent when he spoke with the detectives. At the same time, other competent evidence in this record points to the opposite conclusion. Conflicting evidence does not vitiate the conclusive and binding effect of the trial judge's findings on the appellate court.

93 N.C. App. at 213, 377 S.E.2d at 293.

Whether this Court agrees with the state appellate court or the state trial judge—or, for that matter, the forensic psychiatrist who testified for the State—is not the object of this argument. However, if a trial court judge ruled that Blackmon was competent to confess to Holder and Munday, based on the expert testimony and professional opinion of a forensic psychiatrist, and then an appellate court affirmed the competency determination—how could two police officers in 1983 be expected to have arrived at any different conclusion? Worse, how could these two police officers be held individually liable almost four decades later for conduct that was endorsed by a trial court and an appellate court of that time?

There simply was no contrary authority directing the Court of Appeals in 1989, and certainly none directing Holder and Munday in 1983, to support the Complaint's unadorned allegation that "defendants did know—that the tactics used in interrogating Blackmon were… highly likely to generate a false confession." (Appellant Br. 33, ECF No. 19; J.A.75.) As such, the factual allegations do not identify, and as a matter of law Holder and Munday could not have had, the "reckless" state of mind required to state a claim under § 1983.

28

Accordingly, the District Court was correct in concluding that the Complaint depicts, at best for Appellant, a negligent state of mind by Holder and Munday in crediting the available inculpatory evidence over the available exculpatory evidence and thus pursuing Blackmon's confession. Since negligence is not actionable under § 1983, the Court should affirm the District Court's dismissal of such claims against Holder and Munday.

## II. THE DISTRICT COURT CORRECTLY REJECTED THE APPELLANT'S ASSERTION THAT ITS RULINGS WERE "CLEARLY ERRONEOUS."

In his second of two assignments of error, Appellant seeks reversal of the District Court's Order denying his Motion to Modify its Dismissal Order. (J.A.172-180; J.A.364-376.)[6] Appellant contends that "the District Court acted under a misapprehension of law when it made this ruling," *i.e.*, the dismissal ruling. (Appellant Br. 34-35, ECF No. 19.) Appellant charges that the refusal of the lower

---

[6] It is unclear from the Appellant's briefing whether he is appealing that portion of the Order denying the Motion to Modify which also denied the Appellant's alternative Motion to Amend the Complaint. There seems to be an implicit reference to the proposed Amended Complaint (J.A.182-256), as Appellant contends that "the addition of allegations of manipulative tactics to the mix was not sufficient to tip the scale in favor of reckless conduct." (Appellant Br. 35, ECF No. 19.) However, while briefly identified in the "Statement of the Case" section of Appellant's Brief at page 22, in the actual Argument, no Joint Appendix reference is made by the Appellant to the portion of the Order denying the alternative Motion to Amend, nor is any case law cited in support of reversing that specific portion of the District Court's Order. (J.A.373-376.) In any event, any "addition of allegations of manipulative tactics" fails for the reasons already discussed *supra*.

court to bend to his reiterated arguments was an abuse of discretion. (*Id.*) Appellant is mistaken.

Appellant's criticisms of the Order on the Motion to Modify are simply variations on his criticisms of the Court's dismissal order. For example, Appellant again assigns error to the District Court, claiming it "gave the anonymous and vague inculpatory evidence" relating to the Dorothea Dix informant and the Kelly photo array "far more weight than it was entitled to because it did not view the allegations in the light most favorable to the plaintiff." (Appellant Br. 37, ECF No. 19.)[7] Appellant points to two examples in which, he contends, the District Court failed in this regard.

First, Appellant complains that the lower court relied on the alleged inculpatory evidence concerning the Dorothea Dix sources but disregarded Appellant's allegation that Holder and Munday did not identify the sources, confirm their reliability, or otherwise investigate such sources. (Appellant Br. 36, ECF No. 19.) One is left to wonder, however, what reasonable inference is to be derived from such an allegation. Appellant does not tell us, and that is because such an allegation

---

[7] This assertion is an apparent shift from the Appellant's misstatement elsewhere in his Brief that the only inculpatory evidence available to Holder and Munday was "what they had fabricated." (Appellant Br. 24, ECF No. 19.) It is clear from the allegations of the Complaint that there was inculpatory evidence known to Holder and Munday apart from Blackmon's inculpatory statements to them.

does not lead to a reasonable inference of reckless conduct, particularly given the inculpatory Kelly photo array followed by Blackmon's own statements.

Second, Appellant criticizes the District Court for relying on the inculpatory nature of the Kelly photo array but not giving any weight to the subsequent live lineup in which Kelly is alleged to have stated that Blackmon did not look like the suspect she observed at the murder scene immediately before Helena Payton was discovered. (Appellant Br. 36-37, ECF No. 19.)  However, the Kelly live lineup occurred on October 31, 1983, *after Blackmon's inculpatory statements*.  (J.A.44-61.)  By the time of the live lineup, then, the alleged unconstitutional conduct on the part of Holder and Munday had already occurred and the lineup has no bearing on what was known to them when conducting their interview of Blackmon.

Moreover, Appellant's contention that the District Court inappropriately "weighed" the credibility of evidence has no support in the Court's Order.  Instead, the District Court's Order simply makes the point that *the officers* (*i.e.*, not the Court itself) "crediting inculpatory over exculpatory evidence does not amount to a 'willingness to affirmatively distort the truth.'"  (J.A.370) (quoting *Wilson v. Russo*, 212 F.3d 781, 788 (3rd Cir. 2000)).  The District Court summarized the exculpatory evidence alleged in the Complaint, and noted that "[t]aking those allegations to be true, plaintiff's complaint nevertheless also includes evidence suggesting his guilt."

(J.A.370.)    After also summarizing the inculpatory evidence alleged in the Complaint, the District Court concluded that:

> In light of the presence of both alleged inculpatory and exculpatory evidence, it is not plausible to infer that, by pursuing plaintiff's confession and subsequently using it to prosecute him, defendants were acting dishonestly or otherwise attempting to distort the truth.

(J.A.371.)

To support its conclusion, the District Court cited to *Massey v. Ojaniit*, 759 F.3d 343, 355 (4th Cir. 2014) ("That an eyewitness described an assailant as having braids does not, by operation of nature or law, exonerate all suspects who do not have braids; it merely calls into question that aspect of the description as applied against anyone not wearing braids.") The District Court's reference to this Court's opinion in *Massey* is instructive.  Just as this Court endorsed in *Massey*, the District Court accurately considered whether the exculpatory evidence known to the officers affirmatively *excluded* Blackmon as a suspect. (*See*, *e.g.* J.A.371) ("...[A]s the [other of Blackmon's] arrests did not actually overlap with the time of the assault, the records did not necessarily exclude plaintiff as a suspect.").  The Complaint does not contend, nor can Appellant plausibly contend now, that any of the exculpatory evidence known to the detectives as of the time of the confession affirmatively excluded Blackmon from having murdered Helena Payton.

Therefore, the only plausible conclusion the Court can draw is that Holder and Munday were confronted with competing inculpatory and exculpatory evidence

prior to interviewing Blackmon—and then Blackmon made inculpatory statements during said interview—an interview that was found to be lawful by the North Carolina Court of Appeals in 1989.  As such, the District Court's conclusion that "it is not plausible to infer that, by pursuing plaintiff's confession… defendants were acting dishonestly…" (J.A.371) is entirely appropriate, and certainly not an abuse of the District Court's discretion.

Additionally, Appellant's attempt to analogize the facts of this case to *Humbert v. Mayor and City Council of Baltimore City*, 866 F.3d 546 (4th Cir. 2017) is truly an act of trying to force a square peg through a round hole. Appellant's own brief reveals this:

> The Fourth Circuit then concluded that **the statement in the warrant application** that "the victim positively identified Humbert as her attacker **was false** and the officers had an obvious reason to doubt its accuracy before including it in the warrant application…"

(Appellant Br. 39, ECF No. 19) (quoting *Humbert*, 866 F.3d at 557) (emphasis added).

In *Humbert*, the defendant-officers made affirmative misrepresentations in sworn testimony, just as in *Washington II*, but unlike the allegations in this case. The day after her attack, "during or after" a meeting with an officer to generate a composite sketch of the victim's assailant, an officer "showed [the victim] a photo on his cellphone of a man he identified as her attacker."  866 F.3d at 551.  Some days later, after two photo arrays failed to elicit an identification, officers presented

33

the victim with another photo array, this time including Humbert's photograph. *See id*.

While "[t]he victim wrote 'that's him' on the back of the photo [of Humbert] and signed her name," "[s]he then informed [the officers] that she could not positively identify Humbert as her assailant because she needed to see him in a physical lineup and hear his voice." 866 F.3d at 551-52. The officers subsequently stated in a warrant application, "…the victim positively identified him as her attacker," which was false according to the jury's findings in response to juror interrogatories. *Id.* at 556. Instead, the victim simply had an emotional response to seeing a photograph of a person that resembled her attacker (*i.e.*, Humbert) but subsequently withdrew her positive identification. This Court concluded that "[i]t is clear that the probable cause supporting the Officers' application was based primarily, if not entirely, on the false assertion that the victim positively identified Humbert." *Id.* at 557.

There is no analogous "false assertion" by Holder and Munday which Appellant identifies as having formed the basis of probable cause here. Appellant simply contends, incorrectly, that this Court concluded in *Humbert* that "improper influence" "can be the basis for a recklessness (sic), even though it may not amount to coercion." (Appellant Br. 39, ECF No. 19.) Put another way, Appellant argues that the holding in *Humbert* would extend to Holder and Munday's alleged interview

tactics as a basis for reckless conduct. However, the reckless conduct that was the object of the Court's analysis in *Humbert* was **not** the officer showing a photograph to the victim prior to the photo array, but rather, the false and un-caveated assertion in the warrant application that the victim positively identified Humbert. Accordingly, like the other cases selectively quoted by Appellant in his Brief, *Humbert* is entirely inapposite.

The District Court did not err in denying the Appellant's Motion to Modify, and there certainly was not an abuse of discretion. As such, the District Court's Order denying the Appellant's Motion to Modify should be affirmed.

## CONCLUSION

Appellant's federal constitutional claims constitute an attempted evasion from the inevitable immunity afforded to Holder and Munday for any coercive tactics in their interviews of Blackmon that resulted in his own confession. However, in attempting such evasion and instead opting for a "deliberate and/or reckless fabrication" label for his claims, Appellant runs into the wall of his own allegation concerning Holder and Munday's belief in Blackmon's guilt, which blocks the very claims Appellant seeks to bring. Moreover, Appellant's contention that the detectives unconstitutionally failed to abort their pursuit of Blackmon's confession in the face of competing exculpatory and inculpatory evidence fails to state a cognizable § 1983 claim.

Based on this, and all of the foregoing arguments, Appellees respectfully request that the Court AFFIRM both (i) the District Court's Order granting Holder and Munday's Motions to Dismiss as to the § 1983 claims brought against them in their individual capacities (J.A.101-119) and (ii) the District Court's Order denying Blackmon's Motion to Modify (J.A.363-376).

Respectfully submitted this 28th day of October, 2022.

/s/ Jason R. Benton
Jason R. Benton
N.C. State Bar No. 27710
Daniel E. Peterson
N.C. State Bar No. 41251
PARKER POE ADAMS & BERNSTEIN LLP
Bank of America Tower
620 S. Tryon St., Suite 800
Charlotte, NC 28202
Telephone: (704) 372.9000
Facsimile: (704) 334.4706
Email: jasonbenton@parkerpoe.com
Email: danielpeterson@parkerpoe.com

*Attorneys for Appellee James Holder*

/s/ Sonny S. Haynes

Rachel E. Keen
N.C. State Bar No. 27777
Sonny S. Haynes
N.C. State Bar No. 41303
WOMBLE BOND DICKINSON (US) LLP
One West Fourth Street
Winston-Salem, North Carolina 27101
Telephone: (336) 721.3569
Email: rachel.keen@wbd-us.com
Email: sonny.haynes@wbd-us.com

*Attorneys for Appellee Andrew Munday*

/s/ Norwood Pitt Blanchard, III

Norwood Pitt Blanchard, III
N.C. State Bar No. 26470
CROSSLEY MCINTOSH COLLIER HANLEY
  & EDES PLLC
5002 Randall Parkway
Wilmington, North Carolina 28403
Telephone: (910) 762.9711
Email: norwood@cmclawfirm.com

*Attorney for Appellee City of Raleigh*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This Response Brief of Appellees has been prepared in a proportionally spaced typeface using Microsoft Word, Times New Roman, 14 point.

2.    Exclusive of the table of contents; table of citations; certificate of compliance and the certificate of service, this Response Brief of Appellees contains <u>8,468</u> words.

3.    I understand that a material misrepresentation can result in the court's striking the brief and imposing sanctions.  If the Court so directs, I will provide an electronic version of the brief and a copy of the word or line printout.


/s/ Jason R. Benton
Jason R. Benton
N.C. State Bar No. 27710